The next case this morning is Archford Capital Strategies, LLC v. Davis. Arguing for the appellant, Archford Capital Strategies, is Kevin Green. Arguing for the appellee, William Davis, is Vincent DePaul-Reese. Each side will have 15 minutes for their argument. The appellant will also have 5 minutes for rebuttal. Please note only the clerk is permitted to record these proceedings. Good morning, counsel. Good morning, your honor. Mr. Green, are you ready to proceed? I am. Thank you. Then go right ahead. May it please the court. Archford Capital Strategies, LLC is an independent registered advisory financial services firm. Its sole owner is Jim Mayer, who is present this morning. He started the business in 2013 and he's grown it over the years, both organically and by purchasing books of business from other firms. This case involves William Davis's breach of his employment contract with Archford. Mr. Davis entered his contract in 2015. It contains provisions governing the taking of confidential information and a non-solicitation clause with liquidated damages. But this is not a solicitation case, as Archford does not seek to enforce any of those contractual provisions. Rather, in 2019, Mr. Davis and Archford negotiated an amendment to the employment agreement. The parties agreed to a valid and independent post-employment revenue sharing obligation. They agreed to a formula whereby Davis would pay Archford decreasing percentages of revenues received from Archford clients who transferred to Davis during the first two years after his employment with Archford ended. In exchange, Archford agreed to pay Mr. Davis additional bonus compensation. Mr. Davis specifically excluded over 140 clients and prospective clients from that obligation. These were clients he had brought with him to Archford and his prospective clients. The clients David did not exempt, those who were subject to the obligation, included many accounts that Archford had paid nearly $900,000 to purchase, some of whom were then assigned to Davis. Davis accepted the financial benefits of this negotiated agreement and from the clients that Archford assigned to him while employed. Now, the purpose of the revenue sharing is not to inhibit Davis's relationship with clients or to restrict or punish Davis if he solicits clients after his employment ends. The amendment does not prohibit or mention solicitations, and the revenue sharing obligation arises regardless of whether a solicitation is involved. Unlike a non-solicitation clause, it does not restrict Davis's speech or communication with clients, it does not create a break in his relationship with the clients, and it does not attempt to restrict his competition with Archford. To the contrary, it anticipates solicitations and competition, and it contemplates that Davis's continued relationship with his clients may result in a transfer. Thus, the agreement, the formula, and the payments have a distinct and a legitimate purpose, and we don't have to speculate about what that purpose is, because Davis acknowledged in the very text of the agreement what the purpose is, to compensate Archford for its work and investment in these clients, and to constitute, quote, a purchase of his book of business from Archford. As I mentioned, the parties already had a non-solicitation clause with liquidated damages, and that is not at issue in this case, but the fact that the parties negotiated the revenue-sharing agreement after they already had a non-solicitation provision, I think further evidences their intent that the two provisions were not the same. The language they included also makes it clear that the revenue-sharing agreement is not a liquidated damages clause or an indirect penalty for soliciting. Again, it is compensation, not a penalty paid to purchase Archford's book of business. That was the intent of the parties as it was directly and clearly expressed in their contract. Now, after Davis's employment terminated, however, Davis refused to comply with the revenue-sharing obligations after Archford clients that he had not exempted transferred from Archford to Davis. Archford then sued for breach of that contractual provision. On Davis's 2-619 motion, the Circuit Court found that all liability under the revenue-sharing agreement was nullified by a separate document called the Protocol for Broker Recruiting, which excludes liability by reason of the solicitation of clients previously serviced. The court also determined that Davis satisfied all the conditions necessary to invoke the protocol, and it dismissed Archford's lawsuit with prejudice. Now, the court's order should be reversed for two main reasons. First, the Circuit Court incorrectly interpreted the protocol and expanded the scope of its exculpatory clause, all based on speculation that the party's revenue-sharing agreement would hinder client movement. Without any evidence, the court determined that the revenue-sharing obligations hindered clients from moving from Archford to Davis. Now, there's nothing inherent in the revenue-sharing agreement to support that finding. The clients moving to Davis, the clients have no obligation under the agreement, nor is there any evidence of how or whether the clients would even know of its existence to be hindered from moving in the first place. Nor is there any evidence that it hindered Davis from accepting a client or that caused him to tell clients not to move. Quite the opposite, in fact. The only evidence in the record is that clients freely moved from Archford to Davis and Davis accepted them. The Circuit Court said that was an undisputed fact. Now, the second reason for reversal is that even if the court was right that the protocol reaches the revenue-sharing obligations, the court incorrectly shifted the burden to plaintiff and it made unsupported findings of fact to justify its dismissal. In short, the court improperly determined that Davis satisfied the conditions needed to invoke the protocol, despite no evidence in the record.  I have a question for this counsel. If a client, let's say after Davis left, and a client's no longer satisfied with Archford and wants to go with Davis to the new firm, what justification is there for Archford being paid a percentage of that revenue if that decision was solely the decision of the client? I think the justification is what the parties expressed in their agreement. Archford paid for that account in the first instance and it's a reimbursement of what Archford had paid. It's compensation to Archford to purchase that client account. The purchase of the book of business is the justification. Well, they didn't really purchase it. The client just took his business with him in that instance I'm giving you. But the parties, I think, anticipated that that could be a situation and still negotiated what the formula should be and how it should play out in their revenue-sharing agreement. That situation would be known, would be the minds of the parties at the time they contracted. The question here is, does the protocol for broker recruiting extinguish that liability? We're not examining whether that revenue-sharing obligation is reasonable or adequately negotiated or anything like that. The court found that the protocol for broker recruiting extinguished that liability. The first error the court made, I think, was to interpret the exculpatory clause in the protocol broadly beyond prohibitions or restrictions on solicitations. We're dealing with an exculpatory clause that eliminates liability for two things, the taking of client information and the solicitation of client service by the representative. And I think the plain language of the exculpatory clause should be our guide here. It does not include typical language suggesting a broad reach. You know, it doesn't say directly or indirectly by solicitations. It doesn't say there's no liability arising out of solicitations or relating to solicitations, each of which could conceivably envision broader circumstances. It says there's no liability by reason of the solicitation. Now, precision and specificity is the standard when it comes to liability exclusions. And the plain language of the protocol simply does not support the interpretation that bars all liability relating to the transfer of clients. For example, the drafters of the protocol at different places in its two pages use the terms solicitation of clients, the terms the movement of RRs, registered representatives, and the term the transfer of client accounts. But it only used the phrase by reason of the solicitation of clients in the exculpatory clause. That suggests an intent to limit the liability exclusion to solicitations. That is not to eliminate all liability by reason of the movement of the RR or the transfer of a client account. And I think that intent is expressed elsewhere in the protocol. It says RRs who comply with the protocol are, quote, free to solicit customers they serviced. It talks about being free from litigation, quote, with respect to client solicitations. And it says the departing RR talks about the departing RRs, quote, right to solicit. And what this means, especially to a reasonable firm deciding whether to join the protocol, is that you can't stop a representative from taking certain information or soliciting clients they service once they leave, assuming they comply with the protocol. Thus, the case law involving the protocol, minimal as it is, typically involves efforts by firms to prohibit or restrict the solicitation of clients or the taking of client information. None of the cases say that the exculpatory clause eliminates all liability between the representative and the prior firm. We provide an example in our brief that a registered representative who makes defamatory statements in the course of a solicitation would not be shielded from liability by the protocol. The liability there arises out of statements made in a solicitation, yes, but not by reason of the solicitation. While this could conceivably be liability relating to a solicitation, that is not what the protocol says. Ultimately, the plain language of the protocol's exculpatory clause does not reach claims that do not attempt to prohibit or restrict the solicitation of clients. And therefore, it doesn't apply here, as Archford does not seek to prohibit or restrict Davis' solicitations, nor does the revenue sharing agreement do that. Again, nothing is inherent in the revenue sharing obligation that prohibits or limits Davis' ability to solicit his former clients. It doesn't require solicitation to trigger the obligations, as your example, Justice Moore, suggests. It doesn't impose a break in his relationship with his clients as a non-solicitation provision would. It doesn't prohibit his speech with his clients or his communication with his clients as a non-solicitation provision would. It doesn't prohibit competition with Archford as a non-solicitation provision would. Again, it's a recognition that Davis can immediately compete with Archford. It applies to a limited category of clients, and it serves a valid purpose of reimbursing Archford based on a formula the parties negotiated in 2019 when they were already aware of the contractual non-solicitation provision and the protocol. Davis signed that agreement in 2019 in return for additional bonus compensation as well, right? That's correct, Your Honor. That was the other part of the amendment. There was the revenue sharing obligation, and there was also the extra bonus compensation provision. Those were the two terms of the amendment, and all the other terms of the employment contract remained in effect. I'm sorry. So essentially, he got the benefit of that bargain but wants to get out of the contract itself by not having to pay for the revenue sharing, right? That's right, Your Honor. He got the benefit of that bargain. He got the benefit of being assigned the clients that Archford had paid to acquire, and he signed that agreement again at a time when the protocol was in effect, knowing of its existence, knowing also of the non-solicitation provision in his employment contract. And there's nothing in the protocol that says a producer or a person such as Mr. Davis can't enter into such a contract with Archford, or in this case, that may not be clear, but the protocol doesn't say that he couldn't enter that type of a contract, is it? No, it doesn't say that at all. It's less than two and a half pages, Your Honor, and it deals with a protocol for how a departing agent can take certain information and solicit the clients he serviced based on that information. And again, I'm peppering you with questions. I apologize. But part of that too was, under the agreement between Archford and Davis, it was like a sliding scale or a sliding amount over the period of time that would have to be paid back if a client transferred, correct? Right, if a client transferred during the first two years after Davis left, there was a sliding percentage scale. They negotiated 80% the first year, 60% the second year, 40% the third year, then zero. So it's done after that. I do have one question. You had mentioned, I believe in response to Justice Moore's earlier question, that with regard to these clients and this agreement, the agreement was put in place to ensure recompensation, if you will, if a client that was purchased in this book of clients, when Archford bought that book of clients, that if those clients then left and went with one of Archford's former employees, that Archford would be compensated for what they paid for that book of clients at the time. That's correct, yes? It's compensation to recoup their costs. Right, right. To reimburse them for their investment in time and energy and getting the clients and in purchasing books of business, yes. Right. So in regard to clients that would not have been brought in under that purchase book of clients, new clients specifically, that would have come to Archford after they became established and started drawing clients on their own, would this agreement apply to those type of clients as well or just the ones that had been bought, their accounts bought in that book of clients? The agreement would apply to all Archford clients, and the idea is that Archford doesn't just spend money when it purchases a book of business, it spends money to advertise, to get its service out there, to get clients in the first place so that there's the compensatory nature of the agreement, the reimbursement nature of the agreement. And it does relate to the purchase as a book of business, but it's not limited to that reimbursement. And I understand, I appreciate it. I just wanted to clarify, because earlier I was under the impression that it was to compensate for clients that they had bought their accounts. And if a new client came, there was no purchase, there was no expenditure to buy that client's account other than what you're talking about. So, all right. Thank you. I see my time is up, so I will return for rebuttal. Thank you. Thank you, Mr. Green. Before we go, Justice Moore, do you have any questions? No. Okay. Mr. Reese, then go right ahead. Thank you, your honors. My name is, may it please the court, my name is Vincent Reese, and I represent the defendant and the appellee William Davis in this matter. With respect to appellant's claims against Mr. Davis that formed the basis of this appeal, appellant has failed to demonstrate that the circuit court erred in dismissing those claims with prejudice. Accordingly, the record establishes that after reviewing the pleadings and the matters therefore, the circuit court correctly rendered judgment in favor of Mr. Davis. The judgment was rendered pursuant to section 2619. Section 2619 allows the trial court to deal with issues of law and easily proven facts at an early stage of litigation. Specifically, it allows the court to deal with cases when there's an affirmative matter that demonstrates that negates the claim. In this case, the affirmative matter is the protocol for broker recruiting. We'll call it the protocol for short. And I would agree with Mr. Green that the protocol is a very short two and a half page document. The protocol, what's really important is it is a voluntary agreement. It is a voluntary agreement executed by financial firms. And thousands of financial firms have executed this agreement. This agreement was executed to allow financial firms to recruit representatives to come to them in a way and prescribe a manager that would not impose liability upon the representative being recruited or the firm doing the recruiting. And the protocol has been in place now for over 15 years. And again, this is a voluntary agreement that Archford signed so that it could get the benefit of the protocol. That benefit to Archford would be the benefit that when Archford wants to go out and recruit a new broker, they can bring that recruiter into Archford and that recruiter can bring over the business to Archford and neither Archford nor their new representative they just hired would have any liability. That's the purpose of the protocol. That's one of the purposes of the protocol. All right, and on this... Let me stop you for a second. And you may be going to that very next point. So if you were, I apologize for interrupting. But that's the purpose for Archford signing it. For Mr. Davis, signing it seemed to be the benefit, the purpose for him was to be entitled to additional compensations. Well, so Judge, we're talking about two different agreements. And so you're talking about the employment agreement and the amendment to the employment agreement. I'm talking about the protocol. And I'll go right to that in a second, Judge. I was really directing my comments a little bit towards Judge Bowie. Judge Bowie, you were talking about the benefit of the bargain earlier when Mr. Green was talking. I wanted to make sure that we understood that there is a benefit of the bargain at play here. And there's a benefit of the bargain that Archford has availed itself to. And now Archford is having had the ability to recruit people and get people to come to Archford without liability. Archford is now seeking to take that benefit, but also not give the corresponding benefit to other firms because it wants to impose monetary liability on people to other firms. So I just wanted to address a little bit when you talked about the benefit of the bargain, Judge Bowie. Judge Barberis, back to your question. Yes, there are two. There are two other agreements at play. Actually, it's one agreement, the employment agreement, the amendment to the employment agreement. And there was, and I will agree with Mr. Green that the employment agreement was signed in 2015. And notably, that 2015 agreement had a bonus provision in there. And then it had also non-solicitation, non-competition provisions, et cetera, in there. All right. And then in 2019, Archford approached Mr. Davis and told him that he wanted him to sign an amendment to the agreement. That amendment restructured the bonus proceed, the bonus. And it also added in new provisions. And the parties worked on that agreement. What's notable, though, is Archford did this at the time, knowing that as a signatory to the protocol, what that meant. All right. Archford is a sophisticated financial services represent firm that signed the protocol. They knew what the terms of the protocol meant. So when they negotiated this agreement with Mr. Davis, they knew that if he went to another protocol firm, these provisions wouldn't apply. Now, notably, these provisions still would apply if Mr. Davis went to a non-protocol firm. So it's not like this agreement was illusory or didn't have a value to Archford. It simply provided Archford protection in one context, but not the other. So in this case, there are certain facts that really aren't in dispute. All right. We've already talked about the fact that Davis and Archford entered into the employment agreement and the amendment. All right. We also it's not disputed that Archford is a signatory to the protocol. That fact has never been disputed. The protocol allows for the registered representatives to take in for client information and solicit certain clients without monetary liability. And that that phrase is key. All right. There is also no dispute that Davis joined another protocol firm. All right. And after Davis joined the protocol firm, he did what the protocol allows. He solicited clients and those clients transferred. And there is no doubt. There is no doubt also that in their lawsuit, Archford is here, is was here in the trial court and here on appeal, seeking to impose monetary liability on Mr. Davis as a direct result of him having successfully solicited clients and those clients transferring to his new company, which is in direct violation of the protocol. So these are the undisputed facts. And based upon those undisputed facts, the trial court correctly ruled that the protocol bars the very type of agreement that Archford is trying to enforce in this situation. So we've talked and we were talking to Mr. Green earlier, there was a little bit of discuss about the plain language of the protocol. And I think that's important because the protocol is not a complex document. It is a very straightforward written document. What's important is the very first sentence of the protocol says, the principal goal of the following protocol is to further the client's interest of privacy and freedom of choice in connection with the movement of registered representatives between firms. That's the stated purpose. It's to provide clients the freedom of choice and protect that freedom of choice when their representatives move from one firm to another firm. And the protocol's whole purpose says, well, obviously, if we can impose financial penalties or liability on someone when they move to one firm and go to another firm, that is a disincentive for that representative to either solicit clients or accept clients. And if they don't solicit clients or accept clients, that limits the freedom of movement of those clients and the freedom of choice of those clients. That's the stated purpose of the protocol. And that's in the very first sentence. So there's no doubt what the protocol was trying to do. The protocols, what the protocol is designed to do is to allow representatives to leave their firm, go to another firm, solicit clients, and have those clients transfer without any monetary penalty or liability. Now, what Archford says is that you can solicit clients all you want under the protocol without any liability. But if those clients happen to transfer because you solicited them, then there's liability. Now, they call it a revenue sharing. And I'll just briefly speak to that. The revenue sharing starts out at 80% of the gross revenues. I don't know. I think that when you impose 80% of gross revenues before any costs or expenses, I think that's a strong disincentive to engage in activity. Most of us would not work for 20% or less of what we currently do. But in any event, going back to what I said, in this particular case, Archford is very clear in its position. Its position is that there is liability if you successfully transfer, solicit, and clients transfer the protocol. And that is irreconcilable with the plain language of the protocol. And to make matters worse, Archford goes even further and says, well, not only are we entitled to compensation if someone successfully solicits and the clients transfer pursuant to the protocol, well, we're also entitled to compensation if the client just arbitrarily with no solicitation calls up and says, you know what? Archford is not doing a good job. They've messed up my financial investments. I don't want to be with Archford. Can I come to you? Archford's position is that Mr. Davis should pay a 80% penalty for that because that client wanted to transfer their business. Well, if Mr. Davis says, well, look, I can't make any money on this because if I pay the 80% penalty, I'm actually losing money on this transaction. Common sense says, Mr. Davis is going to say, no, thank you. I don't want that because I'll lose money on this deal. It's not profitable for me. Well, who's hurt by that? The person that's hurt by that is the client because now the client wants to be with the representative and that representative has an incentive or disincentive to take their business. And that is the purpose that the protocol is trying to avoid. And that is the exact purpose and the exact remedy that Artford seeks in this appeal. What's notable in this case is there aren't really any facts in dispute. This case is really about the trial court looking at the protocol, reading it, seeing what its articulated purpose is, looking at the fact that the protocol says, this is how you follow and abide by the protocol. And if you do this, there's no liability. Then the protocol goes on to talk about how the transfer process works. And that's really important because if Artford's position was correct, that the protocol doesn't govern the transfer, only the solicitation, there'd be no need to talk about what that transfer process should look like. The very fact that they spent portions of the protocol saying this is how the transfer process works means that the drafters of the protocol clearly contemplated that people would transfer after the solicitation. That was certainly contemplated by the protocol because it's spelled out in the protocol. Now, what's also in the protocol is there are limited situations where the protocol does not apply and the drafters of the protocol spell those out. They say that a protocol doesn't apply in context of a rating claim, but there are no rating claims in this case. They say that the protocol doesn't apply in situations or is limited in situations where there's a services agreement related to a stock benefit plan, but that's not in this case. There are situations when a protocol is limited or doesn't apply when a representative is a member of a team or partnership and there's a team or partnership agreement in place. Again, not an issue in this case. There are reasons when the protocol is limited in situations where the clients were transferred pursuant to a retirement program or retirement agreement. Again, not an issue in this case. So simply put, none of the exceptions, none of the things that the drafters put in the protocol to limit the applicability of the protocol apply in this case and Archford doesn't even allege that they apply. Speaking of Archford's allegations, I think it's important to note that Archford does not allege that Mr. Davis violated the protocol. Nowhere in there do they say that Mr. Davis did not comply with the protocol. They don't say that he stepped outside of the protections of the protocol. That is not an issue in this case. They haven't alleged that. There's not a single allegation in their complaint that says that. Now, I'll quickly touch on the argument that they raised that there somehow was not enough facts in the evidence for the trial court to correctly make their ruling. There were enough facts in the evidence. There's not a lot of facts that are necessary. It is admitted that both Davis and his new firm were signatures of the protocol. All right, the Davis in filing his motion to dismiss asked the court to take judicial notice of the filings in the prior lawsuit. And I'll be remiss if I didn't say that there was a prior lawsuit, Archford one. In Archford one, Archford first sought to enforce, get an injunction against Mr. Davis pursuant to the non-solicitation and non-competition provisions. That matter was decided by the court and ultimately the court declined to issue a permanent injunction on Mr. Davis. And then following that, Archford dismissed that first lawsuit. What's notable is in that first lawsuit, Archford filed a verified petition. They made statements to the court under oath. And some of those statements are important because in this case, Mr. Davis asked the trial court to take judicial notice of the filings in the prior case, Archford one, because they bared upon this case. And some of those statements in Archford's own verified complaint demonstrate affirmatively that Mr. Davis complied with the protocol. In their verified complaint at pages 25 to 28, which is 105 and 106 of the record, Archford states in its own verified complaint that Mr. Davis provided, Archford compiled a protocol list that had all the information that the animation required by the protocol. They also acknowledge the fact that Davis informed Archford that he was invoking the protocol, that he believed the protocol applied, and that he was going to be acting pursuant to and under the protocol. Those matters are all set forth in Archford's own verified complaint in Archford one, which the trial court was asked to take judicial notice of. The trial court did take judicial notice of it. And Archford never made an argument that it was improper to take judicial notice or introduce any contrary evidence in form of a counter-affidavit or anything else to dispute those facts. So if we look at the fact that the protocol was in place, they were both signatories of it, the evidence is Davis complied with the protocol and was entitled to its protections, then the plain language of the protocol demonstrates in this case that Mr. Davis has no monetary liability or otherwise to Archford. I see that my time is up unless the court has any questions. Thank you, Mr. Reese. Justice Moore or Justice Barber. She have any questions? No, no. All right. Thank you, Mr. Reese. Thank you, Mr. Green. Your rebuttal, please. Thank you, Your Honor. Mr. Reese, I think, kept shortcutting what the protocols exculpatory clause actually says. He kept saying it extinguishes liability between the firm and the registered representative, but he kept leaving out the language by reason of the solicitation of clients previously serviced. Now he says our agreement does that because it serves as a disincentive for someone to accept or to solicit clients. But there's no evidence in the record showing that's the case. And it doesn't inherently do that. And the only thing in the record we know, which Judge Steele said was undisputed, is that clients transferred from Archford to Davis. So he clearly wasn't disincentivized to accept them under the terms he negotiated. So that argument, if that's the standard, we're not there. But that's not even where we need to be because the protocol doesn't even reach that far. We have to examine whether the agreement at issue prohibits or restricts solicitations. And that does not do it here. Now, there was also discussion of, well, Archford entered the protocol voluntarily knowing what it was doing. Well, the protocol says it eliminates liability by reason of the solicitation of clients. So a reasonable firm like Archford reads that and understands that to mean it can't prohibit the solicitation agree. It can't enforce non-solicitation agreements. Again, this is not a solicitation case, though. And so what would Archford think when it's reading that and deciding whether to join? I don't think it would think what the judge said below, that that is a restriction on liability anytime there's a movement of a client after the employment ends or anytime there's a transfer. That's not what the protocol says. The question is whether the protocol should be expanded to extinguish liability by reason of the specific revenue sharing agreement that the parties negotiated in 2019, which doesn't prohibit or restrict solicitations, doesn't place obligations on clients or hinder their movement, didn't inhibit Mr. Davis from soliciting or accepting clients who chose to move, use decreasing percentages negotiated by the parties, excluded over 140 of his clients and prospective clients, and expressly stated that the formula was intended to constitute a purchase of the book of business. Now, if we're using common sense, as Mr. Davis suggested, we should, and we're trying to see if the protocol applies to that agreement, the answer should be no. What the circuit court did was expand the scope of the exculpatory clause by looking at the purpose of the protocol. It essentially elevated that general language about the purpose of promoting client choice over the specific language about what is specifically excluded from liability, liability by reason of solicitation. And the exemptions that Mr. Reese mentioned, I think are helpful because that shows the purpose of promoting client choice is not all encompassing. The drafters envision scenarios where non-restrictive, non-solicitation covenants would be enforced. And so the purpose of promoting client freedom of choice does not override the protocol's texts or reach to what the circuit court said to any movement, regardless of whether there's a solicitation. And I think the circuit court's example provided by Davis in his brief, that the protocol would inhibit even a provision requiring Davis to pay $1 upon a transfer. Now that interpretation is simply not supported by the protocol's text and unlikely to be what a reasonable firm imagined when it joined the protocol. And practically, I think the implications of that interpretation  because what will happen when firms hear that that's what the protocol means, while they may appreciate giving clients freedom to move, if that means they can't negotiate in advance for purchases of their book of business, they may take a second look at that voluntary protocol and they may do what Archford did and promptly withdraw from the protocol. So ultimately the effect of an interpretation that promotes the protocol's purpose over its text may end up defeating that very purpose by taking us back to the pre-protocol world of non-solicitation clauses with frequent and contentious litigation. So your honors, for all the reasons we've discussed today and those set forth in our briefs, the protocol's exculpatory clause does not reach the valid and the independent revenue sharing obligation that Mr. Davis negotiated and agreed to in 2019. But even if it does, Davis failed to establish his right to invoke the protocol. There was never any fact before the court that Davis complied with the protocol or that his new firm complied with the protocol. The first litigation was initiated before he started employment at a new firm, so it could not have decided if that fact was true or not. What the circuit court did was said the absence of an allegation by plaintiff that he complied with the conditions precedent was sufficient to establish them. That shifted their burden of proof on their 619 motion to us, the plaintiff, to plead around it. So that was a second error. Therefore, Archford asked this court to reverse the circuit court's orders, granting Davis's motion to dismiss and awarding him attorney's fees and to remand the matter for further proceedings. Thank you. Thank you, Mr. Green. Excuse me. Before we finish, Justice Moore or Justice Barberis, do you have any final questions? Mr. Green, that was a really great timing. I saw you were looking at the clock and two seconds off. That was clock is helpful. Well, Council, obviously we will take this matter under advisement. We will issue an order in due course, and we hope you all have a great day. Thank you, Your Honors. Take care. Thank you. Thank you.